**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| BUFFETS HOLDINGS, INC., | ) | Case No. 08-10141 (MFW) |
| a Delaware corporation, et al, | ) |  |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) |  |
| BUFFETS, INC., | ) |  |
| HOMETOWN BUFFET, INC., | ) |  |
| OCB RESTAURANT COMPANY, LLC, | ) |  |
| OCB PURCHASING CO., | ) |  |
| TAHOE JOE'S, INC., | ) |  |
| OCB LEASING COMPANY, LLC, | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) | Adv. No. 09-50894 (MFW) |
|  | ) |  |
| CALIFORNIA FRANCHISE | ) |  |
| TAX BOARD, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**OPINION**[1]

The issues presented by the summary judgment motions before

the Court are (1) whether the FTB[2] used an appropriate method to

apportion the share of the Debtors' unitary business income that

is taxable to California when calculating its amended claims and

---

[1] This Opinion constitutes the Court's findings of fact and
conclusions of law, pursuant to Rule 7052 of the Federal Rules of
Bankruptcy Procedure.

[2] The Franchise Tax Board (the "FTB") is an agency of the
State of California, empowered under California Corporation Tax
Law to assess and collect California corporate franchise tax and
to make refunds of overpayments of California corporate franchise
tax, together with interest thereon.

(2) whether the Debtors qualified for the Manufacturers'
Investment Credit (the "MIC").  For the reasons stated below, the
Court concludes that the FTB did use an appropriate method to
apportion the share of the Debtors' unitary business income that
is taxable to California when calculating its amended claims.
The Court, however, finds that the Debtors do qualify for the
MIC.  Consequently, on the apportionment method, the Court will
grant the FTB's summary judgment motion and deny the Debtors'
motion, but on the MIC issue, the Court will deny the FTB's
summary judgment motion and grant the Debtors' motion.

I.   <u>BACKGROUND</u>

     Through operating company subsidiaries, the Debtors owned
and operated the largest chain of family buffet restaurants in
the United States.  The Debtors' restaurants included HomeTown
Buffet, Old Country Buffet, Roadhouse Grille, and Tahoe Joe's.
The Debtors maintained restaurants and distribution centers
throughout the United States during the relevant taxable years
(the "Treasury Years").[3]  The Debtors maintained their corporate
headquarters and principal place of business at all relevant

---

     [3] For purposes of the FTB's claims against the Debtors for
California corporate franchise tax liability, the taxable years
are those ending December 31, 1997 ("TYE 12/1997"), December 31,
1998 ("TYE 12/1998"), December 31, 1999 ("TYE 12/1999"), October
4, 2000 ("TYE 10/2000"), January 2, 2002 ("TYE 1/2002"), June 30,
2005  ("TYE 6/2005"), and June 30, 2006 ("TYE 6/2006").

times in Eagan, Minnesota.  The Debtors' executive management, finance, legal, treasury, accounting, human resources, research and development, information technology, tax, and marketing functions were all based in Eagan, Minnesota.  Each of these functions was part of the Debtors' single unitary restaurant business, and each of these functions contributed to the Debtors' unitary business income.

On January 22, 2008, the Debtors (and several of their affiliates) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  On July 10, 2008, the FTB filed proofs of claim against the Debtors for corporate franchise taxes.  On April 13, 2009, the Debtors commenced this adversary proceeding seeking a determination that they did not owe the additional corporate franchise taxes asserted by the FTB. Motions for summary judgment were filed by the FTB and the Debtors, have been fully briefed, and are ripe for decision.

II.  <u>JURISDICTION</u>

The Court has core jurisdiction over the motions for summary judgment, which essentially involve the allowance of the FBE's claims.  11 U.S.C. § 505(a)(1); 28 U.S.C. §§ 157(b)(1)(B) & 1334. <u>See, e.g.</u>, <u>Stern v. Marshall</u>, 131 S. Ct. 2594, 2618 (2011) (concluding that "the question [of bankruptcy court jurisdiction] is whether the action at issue stems from the bankruptcy itself

or would necessarily be resolved in the claims allowance process"), 2629 (dissent) (noting that "when the individual files a claim against the estate, that individual has 'triggered the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power.'") (citing Langenkamp v. Culp, 498 U.S. 42 (1990)).


III. DISCUSSION

    A.   Standards for Summary Judgment

    In considering a motion for summary judgment under Rule 56,[4] the court must view the inferences from the record in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hollinger v. Wagner Mining Equip. Co., 667 F.2d 402, 405 (3d Cir. 1981). If there does not appear to be a genuine issue as to any material fact and on such facts the movant is entitled to judgment as a matter of law, then the court shall enter judgment in the movant's favor. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).

    The movant bears the burden of establishing that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986); Integrated

---

    [4] Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

Water Res., Inc. v. Shaw Envtl., Inc. (In re IT Group, Inc.), 377
B.R. 471, 475 (Bankr. D. Del. 2007).  A fact is material when it
could "affect the outcome of the suit."  Anderson, 477 U.S. at
248.

The parties in this case agree that there are no genuine
issues of material fact and that the issues presented are legal.
Therefore, the Court may enter summary judgment.  See Matsushita,
475 U.S. at 587.

B.   Alternative Apportionment Method Under California
     Revenue and Taxation Code § 25137

The Debtors' treasury department, in Eagan, Minnesota,
provided treasury services for the Debtors' unitary business.
The treasury department invested cash in U.S. commercial paper
and money market funds (collectively the "Treasury Investments")
on behalf of the unitary business.  The treasury department
derived gross receipts from these Treasury Investments.  The
investment activities ensured that the Debtors' working capital
earned maximum returns while still being readily available for
use in the restaurant business.  The Debtors' treasury operations
gave rise to business income and expenses occurring in Minnesota.

During each of the Treasury Years, the Debtors treated the
income generated by their Treasury Investments as business income
subject to apportionment.  The Debtors included the gross
receipts from their Treasury Investments in the formula for
determining the California franchise tax for the Treasury Years.

5

The FTB audited the Debtors' California franchise tax returns for the Treasury Years and issued Notices of Proposed Assessments asserting additional California franchise tax and interest was due.  For each Notice, the FTB excluded all gross receipts from the Debtor's Treasury Investments from the formula.  The proofs of claim filed by the FTB are based on the Notices of Proposed Assessment.

The issue in this adversary involves a dispute over the proper amount of the Debtors' gross receipts from Treasury Investments, if any, to be included in the formula for calculation of franchise taxes for the Treasury Years under California Revenue and Taxation Code (the "CRTC") sections 25120(e) and 25134.  Section 25134 provides as part of the formula that: "The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the taxable year, and the denominator of which is the total sales of the taxpayer everywhere during the taxable year."  Cal. Rev. & Tax. Code § 25134.  Section 25120(e) provides that for taxable years beginning before January 1, 2011, "sales" means all gross receipts of the taxpayer not allocated under sections 25123 to 25127, inclusive.  Cal. Rev. & Tax. Code § 25120.

The FTB argues that including the Treasury Gross Receipts[5] in the denominators of the Debtors' sales factor for the Treasury Years leads to an apportionment factor that does not fairly represent the extent of the Debtors' California business activities.  As a result, the FTB argues that an alternative method of apportionment is warranted under section 25137 which provides:

> If the allocation and apportionment provisions of this act do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the Franchise Tax Board may require, in respect to all or any part of the taxpayer's business activity, if reasonable: (a) Separate accounting; (b) The exclusion of any one or more of the factors; (c) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or (d) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

Cal. Rev. & Tax. Code § 25137.  Here, the FTB recommends, as an alternative method of apportionment, including in the formula only the interest income or gain from Treasury Investments and not the return-of-principal amounts of the Treasury Gross Receipts.

Under section 25137, the FTB is statutorily authorized to use an alternative method of apportionment if it can prove by clear and convincing evidence that: (1) the standard formula

---

[5] The return-of-principal and income receipts from the Treasury Investments will be referred to as "Treasury Gross Receipts."

results in an apportionment of the Debtors' income to California that does not fairly represent the extent of the Debtors' California business activities, and (2) the FTB's alternative method of apportionment is reasonable.  Microsoft Corp. v. Franchise Tax Bd., 139 P.3d 1169, 1178 (Cal. 2006).

      1.   Fair representation of Debtors' California
           business activities

The Debtors argue that the FTB has not established by clear and convincing evidence that the inclusion of the Debtors' Treasury Gross Receipts in the formula under sections 25120 and 25134 does not fairly represent the extent of the Debtors' business activity in California.

In Microsoft, the California Supreme Court formulated a two-prong test for deciding whether to apply an alternative method in place of the standard formula where treasury receipts are part of the taxpayer's gross receipts.  Microsoft, 139 P.3d at 1178.  The first prong requires courts to consider whether the treasury functions are qualitatively different from the taxpayer's principal business.  Id. at 1178-82.  The second prong requires courts to consider whether the quantitative distortion that arises from the inclusion of the treasury receipts is substantial.  Id.

With regard to the second prong, the court in Microsoft examined three factors: 1) the quantitative difference between the treasury margin and non-treasury margin; 2) the quantitative

8

difference between the income produced by treasury activities and the gross receipts generated by treasury activities; and 3) the overall quantitative difference between applying the standard formula with and without the full gross receipts included.  <u>Id</u>.

a.  <u>Qualitative Difference</u>

The Debtors argue that qualitative distortion cannot be established here because their treasury functions were "directly related and indispensable" to their non-treasury activities and far different from the cash management activities in other cases. The Debtors support this contention by emphasizing that the Debtors' restaurant business did not maintain a large reserve of working capital and that the cash invested, and the revenue produced, by its treasury department was critical to its daily operations.

The California Court of Appeals, however, has made it clear that "whether or not this revenue is used to complement the company's primary business is not the test imposed by <u>Microsoft</u>." <u>The Limited Stores, Inc. v. Franchise Tax Bd.</u>, 62 Cal. Rptr. 3d 191, 197 (Cal. Ct. App. 2007) (stating that "[i]t [will] almost always [be] true that a treasury department's revenue production will be utilized to support or enhance the company's primary business.").  The court in <u>The Limited</u> stated that if consideration were given to this factor then the qualitative test required by <u>Microsoft</u> would become illusory.  <u>Id</u>.

9

Therefore, the Court rejects the Debtors' argument, because it is simply not an appropriate factor to consider in determining whether a taxpayer's treasury functions are qualitatively different from its main line of business.  The Court finds instead that the FTB has met its burden of proving by clear and convincing evidence that the Debtors' treasury functions "were qualitatively different from [their] principal business."  In Microsoft, the California Supreme Court found that the operation of a large treasury department unrelated to the taxpayer's main line of business represented a "paradigmatic example" of circumstances that warranted the application of section 25137. Microsoft, 139 P.3d at 1179 (emphasis added) (citing In re the Appeal of Crisa Corp., 2002 Cal. Tax. LEXIS 269 (Cal. St. Bd. Of Equal. June 20, 2002)).  In reaching this conclusion, the court noted that the State Board of Equalization (the "SBE") included in a nonexclusive list of circumstances that warrant the application of Section 25137 that "[o]ne or more of the standard factors is biased by a substantial activity that is not related to the taxpayer's main line of business.  For example, the taxpayer continuously reinvests a large pool of 'working capital,' generating large receipts that are allocated to the site of the investment activity.  However, the investments are unrelated to the services provided by the taxpayer as its primary business."  Id.

In Microsoft, the California Supreme Court found that
"Microsoft's treasury functions [we]re qualitatively different
from its principal business," which was the development and sale
of computer software.  Id. at 1179.  Similarly, in The Limited,
the California Court of Appeals found that The Limited's
"investment[s] in short-term securities . . . [were]
qualitatively different" from The Limited's principal business,
the retail sale of apparel and other products.  The Limited, 62
Cal. Rptr. 3d at 198.  In contrast, where the operation of a
large treasury department was related to the taxpayer's main line
of business the circumstances did not warrant the application of
section 25137.  Microsoft Corp., 139 P.3d at 1179 (citing Appeal
of Merrill, Lynch, Pierce, Fenner & Smith, Inc., 89 S.B.E. 017,
1989 Cal. Tax. LEXIS 18 (Cal. St. Bd. Of Equal. June 2, 1989)
(finding that a taxpayer's "sale of securities on its own account
was not qualitatively different from its main business" because
the taxpayer "bought and sold securities as its principal
business, both as an agent/broker . . . and as a
principal/underwriter.")).

     Unlike the taxpayer in Merrill Lynch, the Debtors in this
case do not provide investment services to participants in the
securities industry.  Rather, like the taxpayers in Microsoft and
The Limited, the Treasury Investments of the Debtors' treasury
department merely provide support to the Debtors' business of

11

operating restaurants.  As a result, the Court finds that the
Debtors' treasury functions were qualitatively different from
their principal business.

          b.   <u>Quantitative Distortion</u>

             i.   <u>Quantitative difference in margins</u>

The Debtors contend that to meet this factor there must be
"several orders of magnitude" in difference between the Debtors'
treasury margin and non-treasury margin, in a strict mathematical
sense.  Specifically, the Debtors contend that there cannot be
quantitative distortion unless the non-treasury margin ranges
from two to three orders of magnitude, or 100 to 1,000 times
greater than the treasury profit margin.  <u>See, e.g.</u>, <u>Microsoft
Corp.</u>, 139 P.3d at 1180 (finding that Microsoft's investment
activities had a marginal rate of return of less than 0.2
percent, while its non-treasury activities had a margin of more
than 31 percent, roughly 155 times greater); <u>The Limited</u>, 62 Cal.
Rptr. 3d at 198-99  (finding that The Limited's investment
activities had a marginal rate of return of less than .1 percent,
while its non-treasury activities had a margin of more than 46
percent, roughly 460 times greater).

In this case, for the six Treasury Years, the average margin
for the Debtors' investment activities was approximately .08
percent, while the average margin for the Debtors' restaurant
operations was 4.25 percent, or 53 times greater.  The Debtors

argue that this difference (53x) is substantially less than the
difference in Microsoft (155x) and The Limited (460x) where
quantitative distortion supported the application of section
23157.

In two recent cases, however, California courts have found
quantitative distortion in circumstances much closer to the facts
of this case.  In Square D, the Superior Court held that a
difference of 74x was sufficient to prove quantitative
distortion.  Square D Co. v. Franchise Tax Bd., CGC 05-442465
(Cal. Sup. Ct. Apr. 11, 2007).  In Microsoft II, the Superior
Court of California held that a difference of 34x and 42x in two
separate tax years was sufficient to prove quantitative
distortion.  Microsoft Corp. v. Franchise Tax Bd., CGC 08-471260
(Cal. Sup. Ct. Feb. 17, 2011).  The Debtors' margin difference
(53x) fits well within the range of quantitative differences
which the California courts have found support the application of
section 23157.  The Court, therefore, concludes that the FTB has
established this factor.

ii.  Income quantitative difference

In evaluating the quantitative level of distortion in
Microsoft, the Supreme Court observed that Microsoft's inclusion
of the full price from the redemption of its marketable
securities in computing the gross receipts for the sales factor
had the effect of grossly distorting the extent of its business

13

activity in California.  <u>Microsoft Corp.</u>, 139 P.3d at 1178-79.
The court illustrated the distortional impact of Microsoft's
practice by noting that, for tax year 1991, its short-term
treasury investments produced 73 percent of its gross receipts
but less than 2 percent of the company's income.  <u>Id</u>. at 1178 n.
17.  Similarly, in <u>The Limited</u>, the Court of Appeals found that
the taxpayer's short-term investments produced less than 1
percent of the company's business income in the relevant tax
years, but over 62 percent and over 52 percent of its gross
receipts in those years.  <u>The Limited</u>, 62 Cal. Rptr. 3d at 198.

      During the Treasury Years at issue here, the Debtors'
treasury activities generated an average of 77 percent of the
Debtors' gross receipts, but only an average of 5.4 percent of
the Debtors' income.  This range falls within ranges in <u>Microsoft</u>
and <u>The Limited</u>.  Therefore, the Court concludes that the FTB has
established this factor.

                    iii. <u>Overall quantitative difference</u>

      Rote application of the standard formula would treat an
average of 77 percent of the Debtors' total sales as occurring in
Minnesota and would treat an average of over 38.5 percent of the
Debtors' income as though it were apportioned to Minnesota solely
because the Debtors' three-person treasury department was located
there.  The distortional impact on income in this case (38.5
percent) is even greater than in <u>Microsoft</u> (24 percent) or <u>The</u>

                              14

Limited (9.25 percent).  Microsoft Corp., 139 P.3d at 1178-1179;

The Limited, 62 Cal. Rptr. 3d at 198.  See also Square D Co., CGC

05-442465 (finding apportionment of 15 percent of the

enterprise's income to the state where its treasury department

was located was distortive.)  Thus, this factor supports the

application of section 23157.

Further, by using the standard formula, the income

apportioned to California is reduced on average 40 percent, and

the Debtors' California franchise tax liability is reduced on

average 44 percent across the six Treasury Years.  While the

reduction of income attributable to California in this case is

lower than that in Microsoft (50 percent) it is even greater than

that in The Limited and Square D (23.5 percent and 18 percent,

respectively).  Thus, the reduction of income attributable to

California, when viewed in comparison with the situations in

Microsoft, The Limited and Square D, supports the application of

section 23157.

Given the previously stated income attribution rate and

reduction of income attributable to California, the Court finds

that the overall quantitative difference in applying the standard

formula supports the application of section 23157.

2.   Reasonableness of alternative apportionment method

The Debtors argue, however, that the FTB has not established

by clear and convincing evidence that its proposed alternative

15

apportionment formula is reasonable.  The Court disagrees.  In
Microsoft, the Supreme Court of California approved an identical
proposal.  Microsoft Corp., 139 P.3d at 1182.  The Court in
Microsoft found that including only the net receipts from
treasury activities in the sales factor was reasonable because
those receipts were "so small in comparison to Microsoft's non-
treasury income and receipts . . . ."  Id.  The same is true
here.

In Microsoft, the net receipts from its treasury activities
was $10.7 million, while its non-treasury activities produced
income of $659 million and gross receipts of $2.1 billion.  Id.
at 1180.  Here, for the Treasury Years, the Debtors' net receipts
from treasury activities was $15.1 million, while its non-
treasury activities produced income of $233 million and gross
receipts of $5.5 billion.  Like in Microsoft, the Debtors' net
receipts from treasury activities are quite small in comparison
to its non-treasury income and gross receipts.

Accordingly, the Court concludes that the FTB's proposal to
include in the formula only the net receipts from the Debtors'
Treasury Investments is reasonable.

C.  Manufacturers' Investment Credit

Section 23649 provides an income tax credit to "qualified
taxpayers" who incur qualified costs in the purchase of qualified
property to be used primarily in any stage of manufacturing in

16

California.  Cal. Rev. & Tax. Code § 23649.  Section 23649(c)(1)
defines a "qualified taxpayer" as any taxpayer "engaged in those
lines of business described in Codes 2011 to 3999, inclusive, . .
. of the Standard Industrial Classification (SIC) Manual
published by the United States Office of Management and Budget,
1987 edition."  Cal. Rev. & Tax. Code § 23649(c)(1).  Codes 2011
to 3999 collectively constitute SIC Division D ("manufacturing")
in the SIC Manual.  Cal. Rev. & Tax. Code § 23649(c)(1).  The
parties dispute whether the Debtors were "qualified taxpayers"
for purposes of the MIC during the years when it was available.[6]

The Debtors argue that their activities, which include the
manufacture of prepared meats, salad dressings and other sauces,
various bakery items, frozen desserts and other products are
specifically defined in SIC Division D.[7]  The Debtors describe
such kitchen and food preparation as their "back of the house"
activities.  According to the Debtors, they only claim the MIC
with regard to those activities.

---

[6]  For purposes of the Debtors' defenses to the FTB's claims
based on MIC, the applicable years are: TYE 12/1997 and TYE
12/1998 (for offset purposes only), TYE 12/1999, TYE 10/2000, and
TYE 1/2002 (for refund purposes only), TYE 1/2001 and TYE 7/2002
(for carryover purposes only) (collectively the "MIC Years").

[7]  SIC Division D includes food production and processing
activities including meat processing (2013 and 2015), bakery
(2051 and 2052), seafood (2092) and manufacturing prepared foods
and miscellaneous food specialties not elsewhere classified
(2009).

The FTB does not dispute the nature of the Debtors'
activities.  Instead, the FTB contends that the Debtors'
restaurant and food preparation processing activities during the
MIC Years do not qualify as manufacturing activities under
Regulation 23649-3,[8] which imports the entire SIC Manual
classification scheme.  Under the SIC Manual, manufacturing
activities are described in SIC Division D, whereas activities
specifically identified as "Buffets" or "Restaurants" are
described in SIC Division G under "Retail" and "Eating Places."
SIC Manual, Code 5812: Eating Places, available at
http://ohsa.gov/pls/imis/sic_manual.html.  According to the FTB,
a taxpayer may only claim the MIC if its activities are only
classified in SIC Division D.  If they are described in any other
division of the SIC Manual, such as SIC Division G, then the FTB
contends that the taxpayer is not entitled to the MIC.  Applying
the entire SIC Manual to this case, the FTB asserts that the
Debtor was primarily engaged in retail activity described in SIC
Division G not in the activities described in Division D and thus
they are not entitled to the MIC.

The Debtors respond that Regulation 23649-3 has been
determined to be invalid as inconsistent with the statutory

---

[8]  California Code of Regulations, title 18, section 23649-3
("Regulation 23649-3") was enacted by the FTB to "carry out the
purposes of [section 23649]."  Cal. Rev. & Tax. Code § 23649(c).
Regulation 23649-3 imported the entire SIC manual and its
classification scheme.

language of section 23649.  Appeal of Save Mart Supermarkets, Op.
on Rehearing 2002-SBE-002, 2002 Cal. Tax LEXIS 80 (Cal. St. Bd.
of Equal., Feb. 6, 2002) (holding by the State Board of
Equalization (the "SBE") that Regulation 23649-3 "alters and
enlarges on the words of the statute, and is thus invalid.").

    In Save Mart, the business seeking the MIC was a grocery
store which had a full service bakery and meat department.  Id.
at *3.  The FTB in Save Mart asserted that while the bakery and
meat department might have qualified as manufacturing under SIC
Division D, the SIC manual requires that if the taxpayer is
"primarily" engaged in retail trade under SIC Division G, it is
not engaged in business under SIC Division D.  Id. at *6.  The
SBE rejected the FTB's argument, because it concluded that the
MIC should be interpreted liberally in favor of taxpayers.  Id.
at *10.  The SBE found that Section 23649's use of the words
"described in" meant only to reference the SIC Manual's SIC
Division D and not the entire manual.  Id. at *11-12.  According
to the SBE, the legislature has in the past, and could have
utilized more expansive wording if it wanted to incorporate the
entire manual.  Id.

    After finding Regulation 23649-3 invalid, the SBE found that
the language of the statute did not require that the taxpayer be
"primarily" engaged in the business of baking or meat processing.
Id. at *12 (finding that despite the taxpayer's retail grocery

19

store operations being "described in other portions of the SIC Manual seemingly to the exclusion of its manufacturing activities, [the taxpayer] does engage in activities described in Division D of the SIC Manual . . . .").

The FTB asserts that the SBE in Save Mart lacked authority to invalidate a regulation duly promulgated by the FTB. Cal. Rev. & Tax. Code § 19333. Rather, such a determination should be left to the courts, who "bear the ultimate responsibility for construing the statute." Citicorp N. Am., Inc. v. Franchise Tax Bd., 11 Cal Rptr. 509, 522 (Cal. Ct. App. 2000). The FTB, however, admits that the SBE's decision is entitled to some deference in interpreting the statute. Id.

The Debtors respond that the SBE is explicitly authorized to determine the validity of the Regulation, because it is within its duty to determine appeals from actions of the FTB. Cal. Rev. & Tax. Code §§ 19045-19048, 19333. Even if the SBE could not completely invalidate the Regulation, the Debtors assert that the SBE's determination in Save Mart is still "highly persuasive." See, e.g., Hoechst Celanese Corp. v. Franchise Tax Bd., 25 Cal. 4th 508, 524-25 (Cal. 2008) (stating that the amount of deference given to an administrative agency, like the SBE, depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to

persuade, if lacking power to control.") (quoting <u>Yamaha Corp. of</u>
<u>Am. v. State Bd. of Equalization</u>, 19 Cal. 4th 1, 14-15 (Cal.
1998).

The Court finds that the SBE's decision in <u>Save Mart</u> is
persuasive.  The statute does not require that the food
manufacturing or processing be the only business of the taxpayer,
only that some of its activities fit in that section of the SIC
Manual.  The entire SIC Manual is not incorporated in Section
23649, but only Division D.  Therefore, the Court rejects the
FTB's arguments and concludes that because the Debtors "back of
the house" activities are properly classified under SIC Section
D, they qualify for the MIC credit

IV.  <u>CONCLUSION</u>

For the foregoing reasons, the Court finds that the FTB has
established that application of the standard formula does not
fairly represent the extent of the Debtors' California business
activity.  The Court further finds that the FTB has proven that
its proposed alternative apportionment formula is reasonable.
Therefore, the Court concludes that the FTB used an appropriate
method to apportion the share of the Debtors' unitary business
income that is taxable to California when calculating its amended
claims.

21

The Court, however, concludes that the Debtors were engaged in a line of business covered by section 23649 and therefore may claim the MIC Credit during the MIC Years.

An appropriate order is attached.

Dated: August 15, 2011              BY THE COURT:

                                    Mary F. Walrath
                                    United States Bankruptcy Judge